DECISION
{¶ 1} Relator, Commercial Metal Shearing, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission"), to vacate its order awarding temporary total disability ("TTD") compensation, beginning January 8, 2005, to respondent Daniel E. Gustafson ("claimant"), and ordering the commission to enter an order denying said compensation.
 {¶ 2} This matter was referred to a magistrate of this court, pursuant to Civ.R. 53(D) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate examined the evidence and issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) In his decision, the magistrate concluded that the commission abused its discretion in granting TTD compensation. Therefore, the magistrate recommended that this court issue a writ of mandamus ordering the commission to vacate the portion of its staff hearing officer's ("SHO") order of June 21, 2005 that awarded TTD compensation beginning January 8, 2005, and to enter an amended order that denies TTD compensation beginning January 8, 2005.
 {¶ 3} Both relator and claimant have filed objections to the magistrate's decision. Relator's objection is as follows:
THE MAGISTRATE ERRED IN THE CONCLUSION THAT THE INJURED WORKER DID NOT VIOLATE THE EMPLOYER'S WRITTEN WORK RULE. THE VIOLATION OF THIS RULE PRECLUDES THE AWARD OF TEMPORARY TOTAL COMPENSATION.
 {¶ 4} Claimant's objection is as follows:
THE MAGISTRATE IS IN ERROR WHEN HE STATES THERE IS NO MEDICAL FROM WHICH TO RELY UPON TO SUPPORT THE ORDER OF TEMPORARY TOTAL DISABILITY.
 {¶ 5} The issues raised in both of these objections were argued before the magistrate, and thus, in the objections, relator and claimant essentially re-argue the same points addressed in the magistrate's decision. For the reasons set forth in the magistrate's decision, we do not find either relator's or claimant's objections to be well-taken.
 {¶ 6} Following an independent review of the matter, we find that the magistrate has properly determined the facts and applied the appropriate law. Therefore, relator's objection to the magistrate's decision is overruled, claimant's objection to the magistrate's decision is overruled, and we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we grant a writ of mandamus ordering the commission to vacate that portion of its SHO's order of June 21, 2005 that awarded TTD compensation beginning January 8, 2005, and in a manner consistent with this decision, to enter an amended order that denies TTD compensation beginning January 8, 2005.
Objection overruled; writ granted.
Bryant and Travis, JJ., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State ex rel. Commercial Metal Shearing, : Relator, : v. : No. 05AP-1025 Daniel E. Gustafson et al., : Respondents. :
 MAGISTRATE'S DECISION Rendered on June 30, 2006 Stefanski Associates LLC, and Janice T. O'Halloran, for relator.
Urban Co., L.P.A., and Anthony P. Christine, for respondent Daniel Gustafson.
Jim Petro, Attorney General, and Shawn Wollam, for respondent Industrial Commission of Ohio.
 IN MANDAMUS {¶ 7} In this original action, relator, Commercial Metal Shearing, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order awarding temporary total disability ("TTD") compensation beginning January 8, 2005, to respondent Daniel E. Gustafson, and to enter an order denying said compensation.
Findings of Fact:
 {¶ 8} 1. On September 18, 2003, respondent Daniel E. Gustafson ("claimant") sustained an industrial injury while employed as a laborer for relator, a state fund employer. The commission's orders of record indicate that the claim is allowed for "sprain of left foot." An Ohio Bureau of Workers' Compensation ("bureau") order of record indicates that the claim is allowed for "sprain of [left] foot [not otherwise specified]" which corresponds to ICD-9 Code 845.10.
 {¶ 9} 2. The industrial claim is disallowed for "left foot plantar fascitis" and "plantar fascial fibromatosis left foot."
 {¶ 10} 3. In October 2003, relator and claimant entered into a wage continuation agreement whereby relator agreed to pay claimant his full wages in lieu of TTD compensation from the bureau.
 {¶ 11} 4. Shortly after his injury, claimant sought treatment from podiatrist Kenneth J. Emch, D.P.M., who practices podiatry at the "Beeghly Office."
 {¶ 12} 5. Claimant returned to work at Commercial Metal Shearing during May 2004, but was unable to continue working after May 12, 2004.
 {¶ 13} 6. On October 7, 2004, claimant was examined by podiatrist Lawrence A. DiDomenico, D.P.M., who also practices at the Beeghly office. Dr. DiDomenico wrote:
He is seen for second opinion. He relates a workers comp injury.
He sustained an injury on September of 2003 where he twisted his foot and since then has had pain. He has had pain in the arch area and left heel. There has been numbing, tingling and burning sensation since. The patient has had a tremendous amount of conservative care and continues to have pain after improving to a significant degree. The patient has had recurrence and now complains of more numbness and tingling in the heel and arch area. Upon percussion of the posterior tibial nerve the patient has positive Tinel sign and Valleix sign with pain radiating down to the heel region consistent with medial calcaneal nerve entrapment or tarsal tunnel type syndrome which is stemming from his ankle injury of his ankle sprain. There is tenderness on palpation of the inferior aspect of the calcaneocuboid plantar fascia and pain upon dorsiflexion of the toes consistent with acute plantar fasciitis [sic].
[Assessment]
(1) Post sprain/strain type pain of his left foot.
(2) Radiating heel pain and acute plantar fasciitis [sic] and nerve entrapment.
[Plan]
(1) E and M.
(2) I will set him up for PSSD and have him follow-up with Dr. Emch.
 {¶ 14} 7. On October 18, 2004, claimant was examined by podiatrist Mark S. Smesko, D.P.M., who also practices at the Beeghly office. Dr. Smesko wrote:
The patient is followed up to discuss PSSD results. He has a workers comp related injury September 2003.
Upon percussion of the tibial nerve, the patient has positive Tinel and Valleix sign pain radiating down the heel consistent with medial calcaneal nerve entrapment tarsal tunnel syndrome. Clinical examination is about the same. Essentially unchanged.
[Assessment]
Post sprain strain type left foot. Radiating heel pain as well and probable nerve entrapment.
[Plan]
(1) E. and M.
(2) Discussed the results of his PSSD testing.
(3) Have him follow-up with Dr. Emch in one week for reevaluation or sooner if there is any problems.
(4) Dr. Emch will discuss further treatment options with the patient.
 {¶ 15} 8. On Wednesday, January 5, 2005, claimant went to his employer's offices to obtain his check. That event eventually led to claimant's discharge from his employment with relator.
 {¶ 16} 9. The January 5, 2005 incident is reported in a January 6, 2005 company memorandum from Kim Ray to relator's director of human resources, William J. Pounds. The Kim Ray memorandum states:
On Wednesday, January 5, 2005, Dan Gustafson called my office indicating his intent to come and pick up his payroll check from me sometime after 3:00 p.m. that afternoon. At approximately 3:05 p.m., I left my office to go use the copier. When I returned to my office I sensed that Dan had been to my office while I was out because I could smell his cologne. I looked around and saw no note from him. I instinctively opened my cabinet to check to see if his check was still in there and found that it was gone. I went into the hallway to see if he was in the office area. He appeared to be just coming out of the restroom. I asked him if he took his check form my cabinet and he admitted that he had. I told him that was not permitted. He told me he was going to leave me a note to tell me that he had taken it because he had waited several minutes for me and did not know when I would return to my office. I again told him that he was to never get into my cabinet and that he should [have] waited.
 {¶ 17} 10. By letter dated January 6, 2005, Mr. Pounds informed claimant that he was being suspended for five days with intent to discharge. The letter explained:
On January 5, 2005 at approximately 3:00 p.m. you entered the Payroll Office in the main office area and took possession of Company property that was located in the payroll cabinet, without permission.
Your actions constituted theft of Company property which is a violation of the Plant Work Rule A.1 which reads as follows:
"Theft or unauthorized use of Company property is prohibited[.]"
 {¶ 18} 11. Apparently, the union filed a grievance on behalf of the claimant.
 {¶ 19} 12. On January 11, 2005, the union's grievance was heard by Mr. Pounds. Thereafter, Mr. Pounds issued a written decision stating:
Nature of the Grievance
The union stated that there was no dispute regarding the facts in this case. The Union further stated that it felt that the grievant was not trying to enrich himself since the payroll check was written out in his name. The union stated that it felt some sort of discipline should be imposed but that discharge was too severe of a punishment for the offense.
Facts and Discussion
The facts of the case are as follows. On January 5, 2005 at approximately 3:00 p.m., Dan Gustafson entered the Payroll Office in the main office area. The payroll manager was not in her office at the time. The grievant went to the cabinet where the payroll checks are held, opened it and took possession of a check written out to him. He then left the office area. When the payroll manager returned to her office she went to the cabinet where the check had been placed for security purposes. The check was not there. The payroll manager then left her office and observed the grievant coming out of the bathroom which was located down the hall from her office. The payroll manager asked the grievant if [he] had taken the check from her cabinet. The grievant admitted he had.
During the five day initial suspension held on Jan. 11, 2005, the grievant indicated that he stood outside the Payroll Manager[']s office for ten (10) to fifteen (15) minutes, waiting for her return. During the third step meeting the Company submitted a copy of a statement (Exhibit A) that states that the Payroll Manager was only absent form [sic] her office for less than ten (10) minutes.
Discussion
Based on the evidence and Plant Work Rules A-1 and Article XVI-Management This Grievance is Denied.
 {¶ 20} 13. By letter dated January 12, 2005, Mr. Pounds informed claimant as follows:
On January 7, 2005 you were suspended for five days with the intent to discharge for violating the Company Work Rule A.1 which reads: "Theft or unauthorized use of Company property is prohibited."
* * *
During the suspension period you did request a hearing.
The hearing was held on Tuesday, January 11, 2005 and you were represented by the Shop Chairman and the Shop Seward [sic].
At that hearing you did not present any evidence to alter the Company's decision. Therefore, after reviewing all of the facts in this matter, this letter is to serve as notice that you are being discharged for violation of the previously referenced work rule.
The effective date of your discharge is January 12, 2005.
 {¶ 21} 14. On February 3, 2005, claimant was examined by James D. Solmen, M.D. following a referral from Dr. Emch. Dr. Solmen wrote:
HISTORY: Patient is a 49 y/o male steel worker who sustained a work related injury on 9/18/03 while he was at work lifting some heavy metal. He went to pivot on his left foot where he states he felt a pop in the plantar aspect of the heel. He states he had an acute onset of burning and pain. He was able to continue work for only a short period of time. He basically has been off work since his injury. He has been seeing Dr. Emch who is treating him for plantar fascitis, including immobilization, Aircast and PT including electrical stim and ionophoresis. This treatment lasted approximately 6 months. The patient did attempt to return to work May 2004. He was unable to tolerate it secondary to continued burning pain. He describes a severe burning pain in the plantar heel region associated with numbess and tingling in the foot and plantar aspect. He is unable to put weight on the heel and he is now having problems with his right hip and back secondary to his gait abnormality. He has had an MRI and EMG in which he brought the report in today.
* * *
EXAMINATION: * * * Sensation is subjectively intact in the dorsum of the foot but decreased in the plantar aspect. He has a grossly positive Tinel's test to percussion along the Tibial nerve. He has tenderness to deep palpation at the origin of the plantar fascia. Intact strength is noted, which is 5/5 in dorsiflexion, plantar flexion, eversion and inversion. He has no pain with passive ankle, subtalar, transverse tarsal or midfoot motion. Having the patient stand, he has neutral heel alignment bilaterally.
X-RAYS brought in with the patient, lateral HLA view of the heel shows, what appears to be, an area of calcification along the sustentaculum. No note of this was mentioned on his MRI. X-rays repeated in the office today, standing, lateral and HLA view of the heel demonstrates, what I thought to be calcification, is actually a calcification along the posterotibial artery. This is present bilaterally.
MRI report is consistent with chronic plantar fascitis with some marrow edema at the calcaneal tubercle.
EMG he had done 10/13/04 shows evidence of tarsal tunnel syndrome.
IMPRESSION: chronic plantar fascitis secondary to a work injury on the left heel. I believe he has secondary nerve inflammation. I believe it is the nerve that is giving him the majority of his symptoms at present.
RECOMMENDATION: I believe Mr. Gustafson would benefit from a trial cortisone injection in the tarsal canal. I have suggested that he discuss this with Dr. Emch who is, presumably, his doctor of record for his work comp injury. I have issued him an air heel insert which I feel should give him some relief with the pain he is currently experiencing. If he does not do well with the injection, I would consider a formal tarsal tunnel release with a partial plantar fasciectomy. Patient will be going back to see Dr. Emch for a f/u. I would be happy to continue to be involved in this patient's care if Dr. Emch feels this is warranted. I will see him back on a p.r.n. basis.
 {¶ 22} 15. Dr. Solmen's February 3, 2005 report indicates that it was copied to Dr. Emch.
 {¶ 23} 16. On January 28, 2005, claimant was seen by Dr. Emch who wrote:
The patient presents for follow-up of painful foot secondary to sprain. The patient is still experiencing pain at this time.
Pain upon palpation, range of motion and muscle testing. The patient is noted to have antalgic gait upon gain evaluation. Pain at the inferior medial calcaneal tubercle upon range of motion and muscle testing.
[Assessment] Post sprain.
[Plan]
(1) E and M.
(2) The patient was evaluated and is being sent to Dr. Solmen for a second opinion.
(3) I recommended possibly OssaTron procedure for the plantar fasciitis [sic] due to the patient's nonresolution of pain.
 {¶ 24} 17. On January 28, 2005, Dr. Emch filled out a form C-84. On the C-84, Dr. Emch certified a period of TTD from September 19, 2003 to an estimated return-to-work date of February 11, 2005. The C-84 form asks the physician to "list ICD-9 codes with narrative diagnosis[es] for allowed conditions being treated which prevent return to work." In response, Dr. Emch wrote: "845.0 ankle sprain."
 {¶ 25} 18. On February 25, 2005, Dr. Emch filled out another C-84 that certified TTD to an estimated return-to-work date of March 25, 2005. Dr. Emch again listed "845.0 ankle sprain" as the allowed condition being treated which prevents a return to work.
 {¶ 26} 19. On February 28, 2005, the bureau mailed an order stating:
BWC grants temporary total disability (TT) payments from 09/19/2003. Payments will continue based on medical evidence.
The injured worker is being paid regular (full) salary continuance/wages in lieu of receiving temporary total compensation payments from BWC from 09/18/2003 to 01/07/2005. Temporary total compensation will be paid by BWC beginning 01/08/2005.
 {¶ 27} 20. Relator administratively appealed the bureau's order.
 {¶ 28} 21. Following a May 11, 2005 hearing, a district hearing officer ("DHO") issued an order affirming the bureau's order. The DHO's order explains:
It is the order of the District Hearing Officer that the Injured Worker's C-84 request filed 1/31/05 is granted to the extent of this order.
Temporary total compensation shall be paid from 1/8/05 through 3/25/05 inclusive, and to continue upon submission of medical evidence of temporary total disability.
The District Hearing Officer finds that the allowed condition rendered the injured worker temporarily and totally disabled for this period.
The District Hearing Officer finds that the Employer asserted that the injured worker is not entitled to temporary total compensation because he was terminated for violation of a company policy on or about 1-12-05. However, the District Hearing Officer finds that this assertion is not well taken because the Employer has failed to establish that the employee was aware that the cited misconduct would result in termination. The District Hearing Officer notes that the Employer's representative has submitted the "Commercial Metal Forming Plant Rules," but has failed to establish the injured worker's awareness of the policy. Accordingly, the Employer's assertion is not well taken, and the District Hearing Officer finds that the injured worker is entitled to temporary total compensation as ordered.
This decision is based on Dr. Emch's 2/25/05 and 1/28/05 C-84 reports.
 {¶ 29} 22. Relator administratively appealed the DHO's order of May 11, 2005.
 {¶ 30} 23. On June 1, 2005, Dr. Emch filled out another C-84 on which he certified TTD to an estimated return-to-work date of August 1, 2005. He again listed "845.0 ankle sprain" as the allowed condition being treated which prevents a return to work.
 {¶ 31} 24. Following a June 21, 2005 hearing, a staff hearing officer ("SHO") issued an order affirming the DHO's order of May 11, 2005. The SHO's order explains:
* * * [T]he C-84, filed 1/31/05 is granted to the extent of this order.
It is the finding of the Staff Hearing Officer that temporary total compensation shall be paid from 1/8/05 through 6/21/05 inclusive and to continue upon submission of appropriate medical proof of temporary total disability.
It is the finding of the Staff Hearing Officer that claimant has not been deemed to have voluntarily abandoned his former position of employment by his own actions on 1/5/05 due to an alleged violation of company policy i.e. rule# A1 which reads as follows:
Theft or unauthorized use of company property is prohibited.
The Staff Hearing Officer specifically finds and orders that there are insufficient facts indicating claimant violated the above-state[d] rule and/or whether in fact claimant's actions on 1/5/05 were clearly defined as being prohibited under said rule.
The Staff Hearing Officer notes through testimony brought out at hearing that the injured worker's actions obtaining his payroll check would not amount to being classified as either theft or the unauthorized use of any company property.
As such, the Staff Hearing Officer cannot find that injured worker's termination of employment on or about 1/5/05 for an alleged violation of a purported work rule as being tanamount [sic] to a voluntary abandonment of employment.
According[ly], therefore the Staff Hearing Officer finds and orders that claimant remains eligible for payment of temporary total disability benefits herein.
This order is based upon a review of the C-84's on file from Dr. Emch (claimant's attending physician), company policy, employer's letter as well as employer's various letters on file regarding claimant's termination on 1/8/05.
 {¶ 32} 25. Relator filed a notice of appeal from the SHO's order of June 21, 2005. In support of its appeal, relator submitted an affidavit from Mike Conglose, relator's director of manufacturing. The affidavit, executed July 7, 2006, states:
2. I have knowledge regarding the employment of Daniel Gustafson and the basis for his discharge from that employment. I testified regarding these matters before the Staff Hearing Officer on June 21, 2005.
3. The company has plant rules that require discharge for theft or unauthorized use of company property. These rules are posted throughout the plant.
4. The company discharged Daniel Gustafson when he admitted to entering the payroll office, admitted to opening a payroll cabinet and admitted to removing his check when no one else was present.
5. Daniel Gustafson did not have authority to enter the office to open the payroll cabinet and did not have authority to remove his check.
6. The payroll office maintains personnel and sensitive records not available to the public or to employees.
7. The payroll cabinets contain financial records, paychecks and personal information not available to the public or to employees.
8. Daniel Gustafson protested his discharge by filing a grievance through his union representative. During this grievance process, he admitted to entering the payroll office when no one was present, opening a payroll cabinet when no one was present and removing his check without authority.
9. Following the grievance hearing, the union acknowledged this behavior formed a basis for valid discharge.
10. When the company denied the grievance, the union dismissed the matter and chose not to pursue the discharge to labor arbitration.
 {¶ 33} 26. On July 13, 2005, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of June 21, 2005.
 {¶ 34} 27. On August 12, 2005, the three-member commission mailed an order denying relator's request for reconsideration of the SHO's July 13, 2005 refusal order.
 {¶ 35} 28. On September 23, 2005, relator, Commercial Metal Shearing, filed this mandamus action.
Conclusions of Law:
 {¶ 36} The commission, through its SHO, awarded TTD compensation beginning January 8, 2005 based upon Dr. Emch's C-84s. Also, the commission determined that claimant's discharge did not constitute a voluntary abandonment of employment, and thus claimant remained eligible for TTD compensation.
 {¶ 37} Two issues are presented: (1) did Dr. Emch's C-84s constitute some evidence upon which the commission can rely to support its medical determination that the industrial injury prevents relator from returning to his former position of employment, and (2) did the commission abuse its discretion in determining that claimant's discharge did not constitute a voluntary abandonment of employment?
 {¶ 38} The magistrate finds: (1) Dr. Emch's C-84s cannot constitute some evidence to support TTD, and (2) the commission did not abuse its discretion in determining that claimant's discharge did not constitute a voluntary abandonment of employment.
 {¶ 39} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
 {¶ 40} Turning to the first issue, it is well-settled that nonallowed medical conditions cannot be used to advance or defeat a claim for compensation. State ex rel. Waddell v. Indus. Comm.
(1993), 67 Ohio St.3d 452. However, the mere presence of a nonallowed condition in a compensation claim does not itself destroy the compensability of the claim, but the claimant must meet his burden of showing that an allowed condition independently caused the disability. State ex rel. Bradley v.Indus. Comm. (1997), 77 Ohio St.3d 239, 242.
 {¶ 41} The DHO's order of May 11, 2005 identifies Dr. Emch's February 25, 2005 and January 28, 2005 C-84 reports as the evidence relied upon to support the award of TTD compensation beginning January 8, 2005. The DHO's order was administratively affirmed by the SHO's order of June 21, 2005, which states that the order is based upon "the C-84s on file from Dr. Emch." Thus, the two C-84s from Dr. Emch are at issue here.
 {¶ 42} As previously noted, both C-84s list "845.0 ankle sprain" as the allowed condition being treated which prevents a return to work. Also, both C-84s list January 28, 2005 as the last examination or treatment date.
 {¶ 43} According to relator, Dr. Emch's listing of an ankle sprain on the C-84s is fatal to their evidentiary value in the claim because the claim is not allowed for an ankle sprain. Relator also argues that a review of Dr. Emch's office notes reveals that the disability is produced by nonallowed conditions. Thus, according to relator, Dr. Emch has certified TTD based upon nonallowed conditions.
 {¶ 44} In defending its reliance on the C-84s, the commission here contends that Dr. Emch's office notes support the conclusion that he has been treating claimant for the allowed left foot sprain, and thus his listing of ankle sprain on the C-84 should not be viewed as fatal.
 {¶ 45} In the view of the magistrate, the commission's position improperly suggests that this court can, in effect, rewrite the C-84s to correctly list the claim allowance based upon this court's reading of Dr. Emch's office notes. This court must refuse the commission's invitation to read into the C-84s something that Dr. Emch did not write on them.
 {¶ 46} Moreover, even if this court were to accept the commission's suggested proposition that this court can alter the C-84 claim allowance listings in light of the office notes, that task would prove to be much more difficult than the commission seems to suggest here.
 {¶ 47} While Dr. Emch's office notes do indicate that it is the left foot rather than the left ankle that is causing disability, they also can be read to indicate that it is not the left foot sprain that is causing the problem. For example, in his January 28, 2005 office note, Dr. Emch indicates that the nonallowed condition "plantar fascitis" is causing relator pain and could possibly be treated by Ossatron procedure. In the same office note, while Dr. Emch also writes "painful foot secondary to sprain," there is no indication that the left foot sprain is independently causing disability. See State ex rel. GenuineParts Co. v. Indus. Comm., Franklin App. No. 04AP-336,2005-Ohio-1447.
 {¶ 48} Accordingly, based upon the foregoing analysis, the magistrate concludes that the relied upon C-84s from Dr. Emch do not constitute some evidence upon which the commission can rely to award TTD compensation. On that basis, the commission's award of TTD compensation beginning January 8, 2005 must be vacated.
 {¶ 49} Turning to the second issue, a voluntary departure from employment precludes receipt of TTD compensation. An involuntary departure does not. In State ex rel.Louisiana-Pacific Corp. v. Indus. Comm. (1995),72 Ohio St.3d 401, the claimant was fired for violating the employer's policy prohibiting three consecutive unexcused absences. The court held that the claimant's discharge was voluntary, stating:
* * * [W]e find it difficult to characterize as "involuntary" a termination generated by the claimant's violation of a written work rule or policy that (1) clearly defined the prohibited conduct, (2) had been previously identified by the employer as a dischargeable offense, and (3) was known or should have been known to the employee. Defining such an employment separation as voluntary comports with Ashcraft [State ex rel. Ashcraft v.Indus. Comm. (1987), 34 Ohio St.3d 42] and Watts [State exrel. Watts v. Schottenstein Stores Corp. (1993),68 Ohio St.3d 118] — i.e., that an employee must be presumed to intend the consequences of his or her voluntary acts.
 {¶ 50} In State ex rel. McKnabb v. Indus. Comm. (2001),92 Ohio St.3d 559, 561, the court held that the rule or policy supporting an employer's voluntary abandonment claim must be written. The court explained:
Now at issue is Louisiana-Pacific's reference to a written
rule or policy. Claimant considers a written policy to be an absolute prerequisite to precluding TTC. The commission disagrees, characterizing Louisiana-Pacific's language as merely illustrative of a TTC-preclusive firing. We favor claimant's position.
The commission believes that there are common-sense infractions that need not be reduced to writing in order to foreclose TTC if violation triggers termination. This argument, however, contemplates only some of the considerations. Written rules do more than just define prohibited conduct. They set forth a standard of enforcement as well. Verbal rules can be selectively enforced. Written policies help prevent arbitrary sanctions and are particularly important when dealing with employment terminations that may block eligibility for certain benefits.
(Emphasis sic.)
 {¶ 51} Mr. Pounds' January 6, 2005 letter to claimant sets forth the employer's view of the nature of the alleged infraction for which relator was ultimately discharged. The January 6, 2005 letter again states:
On January 5, 2005 at approximately 3:00 p.m. you entered the Payroll Office in the main office area and took possession of Company property that was located in the payroll cabinet, with permission.
Your actions constituted theft of Company property which is a violation of the Plant Work Rule A.1 which reads as follows:
"Theft or unauthorized use of Company property is prohibited[.]"
 {¶ 52} In rejecting relator's claim of a voluntary abandonment of employment, the SHO's order of June 21, 2005 explains:
The Staff Hearing Officer notes through testimony brought out at hearing that the injured worker's actions obtaining his payroll check would not amount to being classified as either theft or the unauthorized use of any company property.
 {¶ 53} While written plant rules prohibit "theft or unauthorized use of Company property," theft or unauthorized use is not specifically defined by the plant rules. Nevertheless, relator argues here that claimant's conduct was a criminal violation of R.C. 2913.02 and 2913.04.
 {¶ 54} R.C. 2913.02 provides:
(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
(1) Without the consent of the owner or person authorized to give consent;
(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;
(3) By deception;
(4) By threat.
 {¶ 55} R.C. 2913.04 provides:
No person shall knowingly use or operate the property of another without the consent of the owner or person authorized to give consent.
 {¶ 56} Significantly, claimant was never prosecuted for the violation of any criminal statute.
 {¶ 57} In the magistrate's view, the record before this court strongly shows that relator's management was primarily offended by claimant having entered the payroll cabinet without authority to do so because the payroll cabinet contained sensitive business records.
 {¶ 58} In her January 6, 2005 memorandum to Mr. Pounds, Kim Ray states that she told claimant "that he was to never get into my cabinet and that he should have waited."
 {¶ 59} Kim Ray did not accuse relator of stealing the check, nor did she ask claimant to return the check when she learned that he had removed it from the cabinet.
 {¶ 60} The offensive conduct does not truly appear to be about the check or the claimant's obtaining the check. Rather, the offensive conduct appears to be about claimant's entering the payroll cabinet without authorization.
 {¶ 61} Given the above analysis, it is clear that the commission did not abuse its discretion in determining that claimant had not in actuality violated the company rule that was the basis for his discharge. Thus, the commission did not abuse its discretion in holding that the claimant did not voluntarily abandon his employment.
 {¶ 62} Accordingly, for all the above reasons, it is the magistrate's decision that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate that portion of its SHO's order of June 21, 2005 that awards TTD compensation beginning January 8, 2005 and, in a manner consistent with this magistrate's decision, to enter an amended order that denies TTD compensation beginning January 8, 2005.
 /s/ Kenneth W. Macke 
KENNETH W. MACKE MAGISTRATE