The STATE ex rel. GOFF, Relator,

v.

INDUSTRIAL COMMISSION OF OHIO et al., Respondents.

[Cite as *State ex rel. Goff v. Indus. Comm.*, 175 Ohio App.3d 60, 2008-Ohio-294.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 06AP–1036.

Decided Jan. 29, 2008.

Gregg A. Austin, for relator.

Marc Dann, Attorney General, and Kevin J. Reis, Assistant Attorney General, for respondent Industrial Commission.

Rademaker, Matty, McClelland & Greve, Kirk R. Henrikson, and Matthew P. Hawes, for respondent Super Lube Inc.

DESHLER, Judge.

{¶ 1} Relator, Joseph Goff, has filed this original action seeking a writ of mandamus from this court ordering respondent, Industrial Commission of Ohio, to vacate its order granting a motion by relator's former employer, respondent Super Lube Inc., to terminate temporary total disability ("TTD") compensation because relator has voluntarily abandoned his employment.

{¶ 2} Pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, we referred the matter to a magistrate, who has now rendered a decision, including findings of fact and conclusions of law (attached as Appendix A). The magistrate has recommended that this court issue the requested writ of mandamus. The employer has filed objections to the magistrate's decision, and the matter is now before this court for independent review.

{¶ 3} Initially, we note that the employer's objections to the magistrate's decision represent the employer's first pleading filed in this court, as the employer did not file a brief before the magistrate. Consequently, the case is in a novel posture before the court. Perhaps because the employer did not file a companion brief to that filed by the commission before the magistrate, the employer now duplicates most of the arguments already set forth before the magistrate by the commission. These generally raise issues regarding relator's alleged abandonment of his employment with Super Lube due to alleged violations of Super Lube's written employee guidelines regarding ethical conduct, specifically handling of customer paperwork, employee time sheets, and use of company facilities to work on relator's personal vehicle.

{¶ 4} The employer now re-presents its position that the conduct at issue constituted a voluntary abandonment of relator's position with Super Lube. We find that the magistrate has completely and definitively addressed these arguments, concluding that in most instances, the employer has mischaracterized inefficiency as dishonesty and has failed to substantiate allegations of theft against relator. There is nothing in the stipulated record or the employer's argument in support of objections that establishes error in the magistrate's analysis of the facts or application of the pertinent law.

{¶ 5} We therefore find, following our independent review pursuant to Civ.R. 53, that the magistrate has properly determined the pertinent facts and applied the relevant law thereto. The employer's objections are overruled, and this court adopts the magistrate's decision as its own, including the findings of fact and conclusions of law contained therein. The requested writ of mandamus is granted, ordering the commission to vacate its staff hearing officer's order of

April 4, 2006, which grants Super Lube's December 13, 2005 motion to terminate TTD compensation, and to enter an order denying Super Lube's motion.

Writ granted.

TYACK, J., concurs.

SADLER, J., dissents.

DESHLER, J., retired, of the Tenth Appellate District, sitting by assignment.

SADLER, Judge, dissenting.

{¶ 6} I agree that Super Lube has waived the arguments contained in its objections because it failed to raise them before the magistrate. *State ex rel. Hackenburg v. Indus. Comm.*, Franklin App. No. 06AP–938, 2007-Ohio-4181, 2007 WL 2327105, ¶ 4. Thus, I, too, would overrule them. However, because I perceive error on the face of the magistrate's decision, I would reject its legal conclusions, pursuant to Civ.R. 53(D)(4)(c). Therefore, I respectfully dissent.

{¶ 7} The September 13, 2005 termination letter advised relator that a work order "had [his] signature and a date as having received monies from a customer. The work order was never converted into an invoice and the monies were not reported as shop revenue." Later, the letter states that relator admitted he had collected cash from that customer during relator's September 1–2, 2005 meetings with Tavakoli. The letter further states that this is a ground for dismissal. The letter constitutes some evidence supporting the SHO's conclusion that relator was fired for violation of a written work rule, given that Super Lube's employee handbook lists "theft of company property" as a dischargeable offense.

{¶ 8} The magistrate quarrels with the fact that the letter did not use the specific word "theft" and concludes that "it is difficult to see how the letter supports a finding that relator was fired for theft or that he committed theft." However, in my view, collecting a cash payment owed to Super Lube from a customer and never turning it over to Super Lube, absent an explanation therefor, constitutes theft.[1] Relator claimed he was unaware of the provisions of the employee handbook, but the staff hearing officer ("SHO") specifically found this to be not credible in light of the fact that relator was a store manager. The commission is the sole evaluator of the weight and credibility of evidence. *State ex rel. Strimbu v. Indus. Comm.*, 106 Ohio St.3d 173, 2005-Ohio-4386, 833 N.E.2d 286, ¶ 10. The record supports the SHO's conclusion that appellant violated the

---

1. Relator was given an opportunity to explain why the monies he collected on behalf of the employer were not turned in to Super Lube, but no explanation was given.

work rule prohibiting theft, and does not support any characterization of relator's conduct with respect to the missing cash as mere incompetence.

{¶ 9} The magistrate cites *State ex rel. Commercial Metal Shearing v. Gustafson*, Franklin App. No. 05AP–1025, 2006-Ohio-5570, 2006 WL 3031185, in support of his conclusion that there is no evidence in the record to support the SHO's finding that relator committed theft. However, in that case, the injured worker called to indicate that he would be in to pick up his paycheck, and after waiting several minutes in the payroll officer's office, he opened her cabinet, which contained other sensitive business documents, and took his paycheck himself, instead of continuing to wait for her. We held that the commission did not abuse its discretion in rejecting the employer's contention that the injured worker had violated a work rule prohibiting theft and unauthorized use of company property because the termination letter revealed that the employer had fired the worker not because he took possession of his paycheck, but because of the manner in which he did so (i.e., reaching into a cabinet containing sensitive company documents). Therefore, *Gustafson* is inapposite to the instant case.

{¶ 10} In contrast, here, there is evidence in the record that relator was fired because he collected cash from a customer in exchange for repair work, but never turned the money over to his employer and never provided an explanation as to the missing money. In my view, then, the record contains some evidence supporting the commission's order, and the commission did not abuse its discretion in concluding that relator voluntarily abandoned his employment. For these reasons, I would reject the magistrate's conclusions of law and deny the requested writ of mandamus. Because the majority does not share this view, I respectfully dissent.

### APPENDIX A

### IN MANDAMUS

{¶ 11} In this original action, relator, Joseph Goff, requests a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate its order granting the employer's December 13, 2005 motion to terminate temporary total disability ("TTD") compensation on grounds that relator voluntarily abandoned his employment, and to enter an order denying the employer's motion.

Findings of Fact:

{¶ 12} 1. Relator has an industrial claim that is allowed for "cervical strain; thoracic strain and a concussion" and is assigned claim number 05–341551. The recognized date of injury is May 4, 2005. On that date, relator was employed by respondent Super Lube Inc., a state-fund employer. Relator was employed as the manager of a Super Lube automobile repair shop located in Westlake, Ohio. That Super Lube shop was owned and operated by Fred Tavakoli.

{¶ 13} 2. Relator filed his industrial claim against Super Lube on May 10, 2005. Super Lube contested the claim.

{¶ 14} 3. Initially, the claim was disallowed by the Ohio Bureau of Workers' Compensation and relator administratively appealed.

{¶ 15} 4. Following a July 1, 2005 hearing, a district hearing officer ("DHO") issued an order allowing the claim and awarding TTD compensation from May 5, 2005, through the date of hearing and to continue upon submission of appropriate medical evidence. The DHO's order states:

> The District Hearing Officer watched a DVD surveillance taken by the employer of the injured worker on 05/18/2005. That surveillance shows the injured worker using a motorized weed wacker around his yard. That tape does not show the injured worker lifting anything heavy, bending awkwardly or in anyway working at activity inconsistent with the receipt of temporary total disability compensation.

{¶ 16} 5. Following a September 14, 2005 hearing, a staff hearing officer ("SHO") issued an order affirming the DHO's order of July 1, 2005.

{¶ 17} 6. Earlier, on September 1, 2005, relator went to a Super Lube store where he recorded conversations between himself and Tavakoli. The next day, relator returned to the Super Lube store and again recorded conversations between himself and Tavakoli.

{¶ 18} 7. By letter dated September 13, 2005, Tavakoli informed relator that he was terminated from his employment at Super Lube. The body of the September 13, 2005 letter states in its entirety:

> To recap our meeting of Friday, September 2, 2005, you were asked to explain the discrepancies involving two invoices and one work order. In the case of the invoices, both showed the customer had been charged for new parts to be installed on their cars. Both customers told me they returned to your shop several times with complaints that they were experiencing the same problem as before having the work done. In both cases, they informed me you inspected these cars and told them there was nothing wrong with the work done and the symptoms were unrelated to the original work. The work order shown to you had your signature and a date as having received monies from a customer. The work order was never converted into an invoice and the monies were not reported as shop revenue.
>
> Regarding the two invoices with new parts charges, you agreed that the parts that were retrieved from the customers [sic] cars were not the new parts for which the customers were invoiced. Your explanation was that you gave the technicians the new parts and you couldn't help it if they did not install them

on the car as instructed. When questioned about your failure to discover the error when the customers returned with complaints, you had no explanation. Regarding the work order that had not been converted to an invoice and the monies never reported as shop revenue, you verified that the signature on the work order was yours and that you had collected the money. Your explanation was that the customer's check did not clear with Certegy so you held the check until the customer returned with cash. However, an invoice was never created to report the transaction and neither the check nor the cash were deposited as shop revenue.

These are not isolated incidents as your personnel file contains other incidents of this nature about which you were notified. This pattern of discrepancies indicates you are grossly incompetent to perform your duties as a manager because you have consistently failed to properly oversee the work of the technicians reporting directly to you and you failed to diagnose the problems when the customers returned with complaints. Additionally, there have been financial discrepancies in your dealings with our customers.

Either of these scenarios is grounds for dismissal and, as such, your employment with Super–Lube & Brake has been terminated, effective September 2, 2005.

{¶ 19} 8. On December 13, 2005, Super Lube moved to terminate TTD compensation on grounds that the termination constituted a voluntary abandonment of employment under *State ex rel. Louisiana–Pacific Corp. v. Indus. Comm.* (1995), 72 Ohio St.3d 401, 650 N.E.2d 469.

{¶ 20} In support of its motion, the employer submitted nine exhibits identified as follows: (1) September 13, 2005 termination letter, (2) invoice dated November 20, 2004, (3) invoice dated April 6, 2005, (4) invoice dated September 28, 2004, (5) timesheet, (6) invoice dated December 23, 2005, (7) invoice dated August 11, 2005, (8) invoice dated July 27, 2004, and (9) invoice dated February 5, 2005.

{¶ 21} 9. Super Lube's motion was heard by a DHO on February 15, 2006. At the hearing, Super Lube submitted pages two and 15 taken from Super Lube's employee handbook.

{¶ 22} Page two of the handbook lists 17 items under "A. General Code of Ethic." Items numbered six and nine state: "Be honest" and "Do not use company resources for your own gain under any circumstances."

Page 15 of the handbook states in part:

B.  Dismissals

Employees must be dismissed immediately under following circumstances[:]

[One]—Theft of company property.

\* \* \*

[Six]—Not following Super–Lube Brake & Mufflers general code of ethics.

{¶ 23} Hand-drawn arrows are drawn towards items numbered one and six, but not towards the remaining five items listed.

{¶ 24} 10. Following the February 15, 2006 hearing, the DHO issued an order granting Super Lube's motion. The DHO's order explains:

It is the order of the District Hearing Officer that the C–86 Motion filed by Employer on 12/13/2005 is granted to the extent of this order.

Temporary total disability compensation is terminated as of the date of notice to claimant of his termination for cause, 09/14/2005. Claimant's firing for financial discrepancies and failure to oversee work of technicians under him are unrelated to the injures in this claim.

The weight of the evidence documented in the motion's exhibits leads the District Hearing Officer to rule that the termination for cause was more than a retaliatory firing; claimant's conduct and work rule violations lead [sic] to employment termination. A voluntary departure from employment under State ex rel. Louisiana–Pacific Corporation v. Industrial Commission of Ohio (1995) 72 Ohio St3d is found to have occurred.

{¶ 25} 11. Relator administratively appealed the DHO's order of February 15, 2006.

{¶ 26} 12. Relator's appeal was heard by an SHO on April 4, 2006. At the hearing, relator submitted a transcript of his conversations with Tavakoli on September 1 and 2, 2005. The transcript is contained in the stipulated record before this court. The magistrate notes that the transcriber frequently indicates that the recording is inaudible.

{¶ 27} 13. The April 4, 2006 hearing before the SHO was recorded and transcribed for the record.

{¶ 28} 14. Following the April 4, 2006 hearing, the SHO issued an order vacating the DHO's order of February 15, 2006, but nevertheless granting Super Lube's motion to terminate TTD compensation. The SHO's order of April 4, 2006 explains:

The Staff Hearing Officer finds that, as of 09/15/2005, the Injured Worker is ineligible to receive Temporary Total Disability Compensation due to a voluntary abandonment of his employment with the named Employer. The Staff Hearing Officer finds that on 09/13/2005, the Employer wrote a letter to the Injured Worker in which he was terminated. The basis of this termination was the Injured Worker's failure to explain various inconsistencies in invoices for work done at the Employer's automobile repair shop. The Injured Worker

was the manager of this particular shop. The Staff Hearing Officer also finds that the transcript of conversations between Mr. Tavakoli and the Injured Worker on 09/01/2005 and 09/02/0005 helps to prove the Employer's allegation that the Injured Worker was terminated due to the invoice irregularities and other employment related items as opposed to this being a retaliatory firing relating to the filing of the instant Workers' Compensation claim. The Staff Hearing Officer finds that the firing was due to a violation of the Employer's written work rules which set forth termination as a consequence for theft from the Employer and failure to follow the Employer's general ethical code. This ethical code required all employees to be honest in their dealings with regard to the Employer's business. The Staff Hearing Officer finds that the Employer has proved that the Injured Worker's termination was due to a violation of these written work rules and that the Injured Worker should have been on notice that termination was a possible consequence of violation of these rules. The Injured Worker indicated that he was not aware of the Employee's Handbook. The Staff Hearing Officer does not find this to be credible in light of the fact that the Injured Worker was the manager of one of the Employer's automobile repair locations. The Staff Hearing Officer finds that the Injured Worker should have been on notice of the contents of the Employee's Handbook.

The Staff Hearing Officer, therefore, finds that the Injured Worker is ineligible to receive Temporary Total Disability Compensation as of 09/15/2005, the date after the last Staff Hearing Officer's hearing on the issue of the payment of Temporary Total Disability Compensation.

{¶ 29} 15. On April 29, 2006, another SHO mailed an order refusing relator's administrative appeal from the SHO's order of April 4, 2006.

{¶ 30} 16. On October 16, 2006, relator, Joseph Goff, filed this mandamus action.

Conclusions of Law:

{¶ 31} It is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.

{¶ 32} In *Louisiana–Pacific,* 72 Ohio St.3d at 403, 650 N.E.2d 469, the claimant was fired for violating the employer's policy prohibiting three consecutive unexcused absences. The court held that the claimant's discharge was voluntary, stating:

[W]e find it difficult to characterize as "involuntary" a termination generated by the claimant's violation of a written work rule or policy that (1) clearly defined the prohibited conduct, (2) had been previously identified by the employer as a dischargeable offense, and (3) was known or should have been

known to the employee. Defining such an employment separation as voluntary comports with [*State ex rel. Ashcraft v. Indus. Comm.* (1987), 34 Ohio St.3d 42, 517 N.E.2d 533] and [*State ex rel. Watts v. Schottenstein Stores Corp.* (1993), 68 Ohio St.3d 118, 623 N.E.2d 1202]—*i.e.*, that an employee must be presumed to intend the consequences of his or her voluntary acts.

{¶ 33} In *State ex rel. McKnabb v. Indus. Comm.* (2001), 92 Ohio St.3d 559, 561, 752 N.E.2d 254, the court held that the rule or policy supporting an employer's voluntary abandonment claim must be written. The court explained:

Now at issue is *Louisiana–Pacific*'s reference to a *written* rule or policy. Claimant considers a written policy to be an absolute prerequisite to precluding [Temporary Total Disability Compensation] TTC. The commission disagrees, characterizing *Louisiana–Pacific*'s language as merely illustrative of a TTC-preclusive firing. We favor claimant's position.

The commission believes that there are common-sense infractions that need not be reduced to writing in order to foreclose TTC if violation triggers termination. This argument, however, contemplates only some of the considerations. Written rules do more than just define prohibited conduct. They set forth a standard of enforcement as well. Verbal rules can be selectively enforced. Written policies help prevent arbitrary sanctions and are particularly important when dealing with employment terminations that may block eligibility for certain benefits.

{¶ 34} Here, the SHO's order of April 4, 2006, finds that relator was fired from Super Lube for theft in violation of a written work rule providing that "[t]heft of company property" is a dischargeable offense.

{¶ 35} Earlier in the order, the SHO states reliance upon a "transcript of conversations between Mr. Tavakoli and the Injured Worker on 09/01/2005 and 09/02/0005" to support the SHO's finding that the termination was not retaliatory for the filing of a workers' compensation claim.

{¶ 36} Earlier in the order, the SHO states that the September 13, 2005 termination letter indicates that "[t]he basis of this termination was the Injured Worker's failure to explain various inconsistencies in invoices for work done at the Employer's automobile repair shop."

{¶ 37} However, the SHO never explains how a "failure to explain various inconsistencies in invoices" constitutes or proves theft. Moreover, the SHO's stated reliance upon the transcript fails to explain how it can be found that relator committed theft of company property.

{¶ 38} The termination letter of September 13, 2005, does not mention the word theft. In the second to last paragraph of the letter, Tavakoli concludes that relator is "grossly incompetent" to perform his duties as a manager and "[a]ddi-

tionally, there have been financial discrepancies." The last paragraph of the letter concludes that "[e]ither of these scenarios is grounds for dismissal."

{¶ 39} Thus, the termination letter, by its own terms, presents two reasons for dismissal—gross incompetence and the financial discrepancies. Nowhere in the termination letter is relator directly accused of theft.

{¶ 40} Yet the SHO's order of April 4, 2006 finds that relator was terminated for theft. The SHO's order fails to explain how the termination letter shows that relator was terminated for theft or that relator committed theft. Moreover, it is difficult to see how the letter supports a finding that relator was fired for theft or that he committed theft.

{¶ 41} During Tavakoli's direct examination, his counsel questioned him as to the relevance of each of the nine exhibits that Super Lube had submitted with its motion filed December 13, 2005.

{¶ 42} Exhibit number two is identified as "invoice dated 11/20/04." The customer on the invoice is Georgetta Williams. During Tavakoli's direct examination, the following exchange occurred:

Q.    * * * Can you tell me what Exhibit 2 refers to?

A.    Yes. This is a tune-up that was done on this car. This is a very difficult car to work on because the rear spark plugs are hard to get to, and they had completely missed half of this tune-up. What they had [billed] was not really what went on this car. I do have the parts from this car.

Q.    Did you confront Mr. Goff with regard to that problem?

A.    We had called him on this. We had called him. This customer actually called us when he was still employed by us, but we didn't see this car until after he had left, but they had done work over again on this car.

Q.    Do you recall if he explained who he felt was at fault for failing to complete that job?

A.    He didn't say. He did not say.

Q.    Could you tell in the invoice if Mr. Vito was the mechanic on that job?

A.    It looks like Mike, and I don't know which Mike because we had several Mikes, but this is by—it's supposed to be the technician in the right-hand corner. It's quite possible that it was him.

Q.    As the manager of the Super Lube, was Mr. Goff's responsibility to make sure that job was performed correctly?

A.    Any job should be done correctly.

{¶ 43} Exhibit number three is identified as "invoice dated 04/06/05." The customer is Ulysses Pearson. During Tavakoli's direct examination, the following exchange occurred:

Q. Could you tell us about Exhibit 3, please.

A. Exhibit 3 is the brake job that was done, front and the rear of this vehicle, both front and back. This customer called me and he said—well, he didn't call. He went to American Express and wanted the refund. He wrote a letter to American Express, I believe.

Q. And was a refund provided?

A. Well, yeah. Well, we told him we're not going to give him a refund until we have the old parts back and sure enough, we got the old parts back, which I have. And he also said that he had taken it back to our shop several times asking Joe to check it to make sure everything was okay because it was still making the noises. So apparently the rear brake pads were never installed.

{¶ 44} Exhibit number four is identified as "invoice dated 9/28/04." The customer is Juliette Collins. During Tavakoli's direct examination, the following exchange occurred:

Q. There is also—at end of that paragraph it states that the work order was never converted into an invoice, and the monies were not reported as shop revenue. What are you referring to?

A. There is a ticket. This here.

Q. That's Exhibit 4?

A. The page here, and this is a work order, and there is no invoice for that.

Q. Do you know if this money was ever paid to Super Lube?

A. I'm not sure.

Q. Do you know what happened to that money?

A. No.

Q. Did it show as being contained in the receipts for that day?

A. No.

{¶ 45} Exhibit number six is identified as "invoice dated 12–23–05." The customer is Donald Schettine. During Tavakoli's direct examination, the following exchange occurred:

Q. Let's move on to Exhibit 6. There was a gentleman named Donald Shelling [sic]?

A. Yes.

Q. Do you recall what occurred with this?

A. This car, they put a timing belt and a water pump on it, and I guess they butchered this car so badly that we had to pay several hundred dollars. I think we had to pay $1800. We had to refund the customer. It was just a job not done right.

Q.  And is the manager responsible to check on what those technicians are going?

A.  Absolutely. Test driving, get it done, test drive it.  All of that.  Incidentally, I didn't realize it until now, but this says this job was done by Joe himself, or maybe Jose.

{¶ 46} Exhibit number seven is identified as "invoice dated 8–11–05."  The customer is Pierre Richards.  During Tavakoli's direct examination, the following exchange occurred:

Q.  All right.  Let's go to Exhibit 7.

A.  Okay.

Q.  Incident involving Ms. Richard [sic]?  Can you tell us what happened in this situation?

A.  This one here she brought her—oh, this one here came back that we had to completely redo all of her brakes for her, and the technician who was in charge of redoing this job claims that this was never done.

Q.  The original services were never performed?

A.  That's what he claimed.  He claimed that the original ones were never done.

Q.  And who would be responsible to oversee that?

A.  That's Joe.

{¶ 47} Exhibit number eight is identified as "invoice dated 7–27–04."  The customer is Cathy Gigueroa.  During Tavakoli's direct examination, the following exchange occurred:

Q.  Exhibit 8, please.

A.  Exhibit 8, I was involved with because she was kind of a mutual customer in a way, but she came in and brought her own struts and they had installed the struts.  She had a tremendous knocking noise in front of her car.  She called me and said, I've been back to Joe three times and he tells me that there is nothing wrong with it, but this car is clunking so badly in the front, and I said, Okay and I called Joe.

Joe said, Oh, yeah Fred, I test drove it.  This is beautiful.  No problem.  There is not a problem with this car.  So I told the customer, Well, bring it in.  Let's get a second opinion.  Let's look at it.  So she brought it in.

I didn't even have to move this car ten feet.  There is something like almost like falling out of the front of the car.  So when we pull it in, the strut we found were installed incorrectly.  The brake hose was scratched so badly that it was about to break any time.  We're talking about safety issues and all he had to

do was put it on the lift and take a look at this thing before it would come to a head. That's all he had to do.

Q. I take it you had to make the proper repairs?

A. Well, we had to give her a strut. We had to change one of the struts out, yes. At no charge.

{¶ 48} During the April 4, 2006 hearing, Tavakoli did not discuss or testify about exhibit nine which is identified as "invoice dated 2–05–05." The customer on that invoice is Dion Jackson. Tavakoli stated that "Mary" would explain exhibit nine, but Mary never testified.

{¶ 49} However, during relator's direct examination, the following exchange occurred regarding exhibit nine between relator's counsel and relator:

Q. Number 9?

A. Number 9. This was a typical dealing with a customer in this area. An old worn car. The customer came in. We did an inspection. We talked to the customer, gave him an estimate. Said it would be so much dollars. He said okay, left the car, do the work. He went and got a sandwich, or whatever. Came back to pick the car up, and when I put his invoice on the screen and asked him for payment, he got all his money and didn't have enough money. So the only thing I could do is he had no money, no other means. Just like Fred told me before, take the matter, make it work do something. We were making a lot of money on the gentleman with our work. I had to discount him down a little bit to make the money he had fit because I can't let him owe or nothing. There is no payment plan or nothing. So I discount his bill.

In the process of doing that, I printed a copy of the original work order then when I did the discount on my screen and went to the next screen and printed it as an invoice, it had a different amount. I turned in both invoices at the end of the night accidentally, and when I added up my totals for the end of the night, naturally they were off.

I put money out of my pocket into the deposit mistakenly in a hurry, because I thought I either lost money, misplaced it, paid out money and then tried to miscount it or something. I thought I made a mistake. So I put money out of my pocket into the deposit. When Mary caught the discrepancy, she called me up and said, There is too much money, or What happened here? You have two invoices and I go, Oh, that's what happened to my money. And she took it as I stole it. I didn't steal the money. * * *

{¶ 50} The magistrate has carefully reviewed the transcript of the April 4, 2006 hearing and the exhibits submitted. The magistrate finds no evidence in the record to support the SHO's finding that relator committed theft of company

property. See *State ex rel. Commercial Metal Shearing v. Gustafson,* Franklin App. No. 05AP–1025, 2006-Ohio-5570, 2006 WL 3031185.

{¶ 51} The SHO also found that relator had violated Super Lube's general code of ethic, which requires that the employee "[b]e honest."

{¶ 52} While it can be said that a person who commits theft is also dishonest, this finding of dishonesty does not appear to be based on facts separate from the SHO's theft finding. Moreover, the term is not defined by the employee's handbook and suffers from such vagueness that it cannot support a ground, under these circumstances, for a voluntary abandonment. And again, the termination letter itself never accuses relator of dishonesty or of violating the written work rule commanding that the employee "[b]e honest."

{¶ 53} Given the above analysis, the magistrate finds that the commission has abused its discretion in finding that relator voluntarily abandoned his employment.

{¶ 54} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to vacate its SHO's order of April 4, 2006, that grants Super Lube's December 13, 2005 motion to terminate TTD compensation and to enter an order denying Super Lube's motion.